[Sac. No. 4093. In Bank.—January 24, 1930.]

HIRAM HENIGAN, Executor, etc., Appellant, v. YOLO FLIERS CLUB et al., Respondents.

Armfield & Eddy, Elmer W. Armfield and Arthur B. Eddy for Appellant.

Huston, Huston & Huston, Arthur C. Huston and Arthur C. Huston, Jr., for Respondents.

PRESTON, J.—Action by plaintiff against defendants for damages for fraud and deceit in the sale and purchase of a tract of land of 152.44 acres in Yolo County, California.

The action was begun more than three years after the alleged fraud was perpetrated. Plaintiff alleged a discovery thereof within the requisite period (sec. 338, subd. 4, Code Civ. Proc.). The court found the existence of the fraud

as alleged, but sustained defendants' plea of the statute of limitations under the section of the code above noted. In sustaining this plea, however, the court found that as a matter of fact plaintiff did make the discovery within the three-year period, but found that, as a matter of law, the existence of certain facts imputed prior knowledge of the fraud to him (sec. 19, Civ. Code).

Plaintiff appealed, but during the pendency thereof died. The cause of action, however, survived (*Wikstrom* v. *Yolo Fliers Club, etc.*, 206 Cal. 461 [274 Pac. 959]).

It is not necessary to pass definitely upon the sufficiency of the evidence to sustain the finding that the fraud was perpetrated upon plaintiff in the transaction, for we are firmly of the opinion that the action of the court below sustaining the statute of limitations must be upheld. Enough of the facts as gleaned from the findings will be stated to set forth this issue.

The whole case centers around the actions of the defendant O. W. H. Pratt, a real estate operator, who at the time in question had under execution a plan to cause the purchase of a large area of land known as the Wolfskill tract and to procure a sale of certain subdivisions thereof to various people, among whom were defendant Yolo Fliers Club, of which he was the active vice-president. This was accomplished. It was the plan of the club, in turn, to subdivide the tract purchased by it and to sell a portion thereof, retaining the remainder for its own purposes, and to that end it had employed its said vice-president, Pratt, upon a five per cent commission, to procure a purchaser for the portion of said lands so to be sold.

At this point it is necessary to advert to a rather unusual situation. Said Pratt for more than seven years prior to said time had been the confidential agent of plaintiff in the purchase, subdivision and sale of real property and through this relationship there had grown up the greatest confidence between them and plaintiff relied upon him and trusted him implicitly, as the court found. It is also a fact that during the negotiations with plaintiff for the purchase of a portion of said tract, as will be hereinafter noted, plaintiff empowered defendant Pratt to act as his agent in the consummation of the purchase and, furthermore, during the pendency of the negotiations, empowered defend-

ant Pratt as his agent to subdivide and sell the property about to be purchased; in fact, the sale was largely induced by the guaranty made by defendant Pratt to plaintiff that he would subdivide and sell a portion of the said property at a large profit to plaintiff. Not only is this true, but defendant Pratt did, in point of fact, become the agent of plaintiff pending the consummation of the sale, for the subdivision and sale of said property and continued as such agent during practically all the time mentioned in the complaint. This relation was apparently known to defendant club, as it expressly consented that Pratt might receive, as a commission, $1,000 from plaintiff for the consummation of the sale here under attack. The actual contract of sale and purchase between plaintiff and defendant club was entered into on October 20, 1919, defendant Pratt signing as vice-president of the club and plaintiff signing in his own right.

The description of the tract so to be purchased was somewhat uncertain and read as follows: "the part of the Rancho Gueisisosi of the Gordon Grant, bounded on the North by the center line of Cache Creek, on the East by the Exterior line of said Rancho, on the South by the right of way of the Woodland and Moore Canal and on the west by a line drawn parallel to the East line of said Rancho and a sufficient distance therefrom to contain 148.3 acres of land between the ditch and the high bank of Cache Creek, together with that portion of the property lying in the low land and extending to the North boundary of the said Rancho. . . . ''

Subsequent to the execution of this contract and prior to the execution of the deed therefor both plaintiff and defendant club jointly engaged a civil engineer to make certain surveys respecting said property. The club sought to have its various subdivisions of the larger tract marked and plaintiff had the tract being purchased by him subdivided into some six smaller tracts. After this survey had progressed to a certain point a sufficient description was procured for the deed and on November 17, 1919, defendant club conveyed to plaintiff said 152.44 acres of land, at a purchase price of $32,012.40, or $210 per acre for the entire acreage deeded. The deed was regularly spread of record and then returned to the bank which had loaned a certain amount of money on the property as security for its ad-

vancement of a portion of the purchase price to plaintiff. Within a very few days after the consummation of the transaction the civil engineer completed his work, making for plaintiff a map showing the entire tract purchased by him and the subdivision thereof into lots, each lot having marked thereon the acreage therein. The total acreages marked in the subdivision comprised in the aggregate the exact number of acres purchased from the club. Plaintiff himself received a copy of this map and had it in his possession for a considerable period of time. He was cognizant of the number of lots into which the larger tract was subdivided; also of the number of acres in each lot, the aggregate number of acres, and of the price per acre desired by him therefor, which said price was largely in excess of the price per acre paid by him. He was also cognizant of the fact that no land was marked for donation to purchasers.

We will now set forth the facts alleged to constitute the issue of fraud. Across the northerly portion of said tract of land from east to west ran a fence. Plaintiff contends that at the time he and defendant Pratt were upon the property during the negotiations, it was pointed out to him that all the land north of said fence was worthless and that it would be donated to him, should he purchase the portion thereof south of said fence. Plaintiff claims that no deduction was made for the said waste area and that he paid full purchase price for the whole thereof, thus paying some ten thousand odd dollars more than he should have paid for the entire acreage purchased. As above noted, the court sustained this contention as to the existence of actionable fraud in the consummation of the transaction.

Plaintiff, while a man of advanced years, was by the court found to be a man of ordinary intelligence. He was a man who had had a considerable experience in the purchase and sale of real property and knew something of deeds and mortgages and their functions. He had a splendid knowledge of farming properties, having lived upon and managed a large farm for a great many years. Admittedly, he had good judgment in estimating acreages of land, being able also to approximate the area by stepping it off and other methods commonly known to experienced farmers.

The map introduced in evidence by the defendant showed 109.20 acres south of said fence and 43.24 acres north

thereof. Plaintiff knew also that the total acreage purchased was 152.44 acres and he knew the price he had paid therefor. If his contention is to be upheld, he must have thought that he was getting 152.44 acres of land in the area south of the fence.

The issue as to the imputed knowledge found by the trial court was one of fact and each case must rest upon its own peculiar facts. We are wholly unable to say that the conclusion of said court is not supported by the evidence. On the contrary, to us the evidence seems clear that plaintiff should have known of the existence of said fraud prior to the three-year period. In the first place, the fraud, if it existed, was not concealed. The means of ascertaining the number of acres paid for and the number donated, if any, were open to plaintiff at all times. The club had directly no dealings with him. Neither the club nor Mr. Pratt did anything to conceal the alleged fraud nor to in anywise prevent plaintiff from pursuing the knowledge the law declares him to have had so as to make complete discovery thereof. As above noted, during and at all times subsequent to the negotiations, Pratt was also the agent of plaintiff and not in all his actions the agent of defendant club.

A visit to the land, or a perusal of the deed, consultation of the map, the knowledge of the acreage bought and the purchase price paid, the fixing of the values on the subdivisions of the tract or the totaling of the acreage in all the subdivisions, or a consideration of the question as to whether waste land was to be donated to purchasers from him would have brought home to plaintiff full knowledge of the facts upon which he urges fraud.

But counsel contends vigorously that inasmuch as the court found actionable fraud based upon a misrepresentation of a material fact to have inhered in and, if acted upon in time, to have vitiated the sale, the rule of constructive notice cannot be applied. He grounds his contention on the rule often announced by this court that "every contracting party has a right to rely on the express statement of an existing fact, the truth of which is known to the opposite party and unknown to him, as the basis of a mutual agreement, and he is under no obligation to investigate and verify the statements to the truth of which the other party to the contract, with full means of knowl-

edge, has deliberately pledged his faith." (*Spreckels* v. *Gorrill,* 152 Cal. 383 [92 Pac. 1011, 1017]; *Teague* v. *Hall,* 171 Cal. 668 [154 Pac. 851]; *French* v. *Freeman,* 191 Cal. 579 [217 Pac. 515]; 12 R. C. L., p. 376.)

But the full application of this rule does not meet the issue here, for after consummation of the sale, facts abundant came to the notice of appellant that could not but have aroused an inquiry as to the true facts. The conscious fact that he had purchased 152.44 acres of land and paid the full price therefor and that no acreage appeared anywhere as donated land, either in the deed or in the map procured by him, and the further fact that, after subdivision, one tract thereof reaching the north line of the tract had been sold within a few days after his purchase and no worthless land was by him directed to be donated to the purchaser, speaks eloquently to the effect that he knew waste area had been bought by him and was being offered for sale at a profit. These facts, in view of the finding of the court thereon, bring into operation the doctrine recognized by the case of *Tarke* v. *Bingham,* 123 Cal. 163 [55 Pac. 759], where, in discussing the facts under the statute of limitations here involved, it was recognized that the rule contended for by appellant here would give way in cases where the facts meet the following test: "The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission."

The case of *Phelps* v. *Grady,* 168 Cal. 73, 79 [141 Pac. 926, 928], is applicable here. In that case the court, discussing laches in seeking relief because of a fraudulent misrepresentation as to value in the conveyance of real property, said in part: "While it is conceivable that a person under such circumstances might misrepresent to another at a distance the value of those lands, it is impossible that that person could have concealed from the grantors knowledge of the true value had the slightest inquiry been made. It cannot be said, therefore, and of course it is not alleged, that Mrs. Phelps ever did or attempted to do anything to conceal from these interveners knowledge of the true value of the land. If, under such circumstances, with every means of information open and patent before them, they may refuse to make inquiries for seven years, they may do so for seventy. There is an absolute failure to show not only due

diligence but any diligence in seeking to discover during all this intervening time whether or not they had parted with their property at a fair valuation.''·

We think the language of *Simpson* v. *Dalziel*, 135 Cal. 599, 603 [67 Pac. 1080, 1082], is applicable here: ''Natural curiosity, as well as business prudence, would have compelled him to make the inquiry, and his failure to make it was inexcusable negligence; and it is well settled in this class of cases that 'one will be presumed to have known whatever with reasonable diligence he might have ascertained concerning the fraud of which he complains.' ''

We cannot accord weight to the contention that by reason of the confidence appellant had in defendant Pratt, he is excused from the operation of the above doctrine. We have already made it clear that we are not dealing with a mere case of actual fraud. That such fraud was committed was found by the court and such finding, for the purposes of this discussion, was accepted as true, but we are in fact here dealing with the finding of the court that the action is barred. The question is: Was the discovery of the fraud, as a matter of law, made more than three years prior to commencement of the action? The sale had been consummated and the agency of Pratt for that purpose had been terminated; hence as against defendant club, appellant had no right whatsoever to rely upon such confidential relationship. Moreover, the court, in *Simpson* v. *Dalziel, supra,* recognizes a principle which would forbid plaintiff from relying upon this relationship, even as against defendant Pratt individually, for the court in that case held that the confidential relation between the appellant and his attorney did not excuse the duty to follow up the lead to full knowledge as to the acts and conduct of such attorney, which inquiry was required by known facts.

In closing the discussion, we would here note that we have not failed to consider the point strenuously urged that the high bank of the creek and the fence are practically the same line and, for this reason, appellant, in view of the deed and map, would be excused from the imputation of knowledge of the fraud. We cannot see how this contention, if true, would overthrow the finding of the court. It would, at most, go only to the weight of a portion of the evidence. If the court had made a finding in appellant's favor on the

issue of imputed knowledge, we would be in an altogether different position. But in fairness it must be said that not all the witnesses understood the high bank line and the fence line to be practically the same. Certainly defendant Pratt did not so consider it and his testimony and the contract of sale appear to agree and would have sustained a finding that only a very much smaller area than the acreage north of the fence was to be donated.

We do not think further discussion is profitable as under well-settled rules we are bound by the finding of the trial court on this issue of imputed knowledge.

The judgment is affirmed.

Richards, J., Curtis, J., Seawell, J., Waste, C. J., Langdon, J., and Shenk, J., concurred.

Rehearing denied.