[Civ. No. 9803.    Third Dist.    Jan. 6, 1961.]

OAT VALLEY LUMBER COMPANY (a Corporation), Plaintiff and Respondent, v. THE STONESON DEVELOPMENT CORPORATION, Appellant; OAT VALLEY LUMBER COMPANY (a Partnership) et al., Cross-defendants and Respondents.

Bell & Cox, Young, Rabinowitz & Chouteau and Walter C. Chouteau for Appellant.

Kasch & Cook for Respondents.

VAN DYKE, P. J.—This is an appeal from a judgment which awards a recovery of $132,773.05 in favor of Oat Valley Lumber Company against The Stoneson Development Company and which decrees that Stoneson recover nothing on its cross-complaints against Oat Valley Lumber Company, San Bruno Lumber Company, Inc., Arnold Sleveland and James Cagle, individually and as copartners doing business under the firm name of Oat Valley Lumber Company, a copartnership, H. H. Bowden, doing business as H. H. Bowden Lumber Company, and Mario Ottonello.

The litigation began with the filing by Oat Valley Lumber Company, a corporation, of an action against Stoneson for the agreed price of 63 loads of lumber alleged to have been sold and delivered to Stoneson during the period between May 16, 1956, and October 5, 1956. Stoneson answered denying generally all the allegations of the complaint. It also filed a cross-complaint against Oat Valley Lumber Company, a copartnership, predecessor of Oat Valley Lumber Company, a corporation; against Oat Valley Lumber Company, a corporation; and Sleveland and Cagle seeking recovery of $100,000 damages based on allegations of fraud. It cross-complained further against San Bruno Lumber Company and against Bowden Lumber Company for damages in the sum of $75,000 and $35,000 respectively based on allegations of fraud. It cross-complained further against Cagle, Ottonello and all other cross-defendants, including San Bruno Lumber Company, for the sum of $210,000 based on allegations of conspiracy to commit fraud. In addition to actual damages, Stoneson prayed

for 50 per cent damages in addition as punitive damages. All of the cross-actions claimed that the cross-defendants, acting in conspiracy, had invoiced appellants for deliveries of lumber not made and upon such invoices had been paid. An amended cross-complaint was filed, specifying particular loads of lumber which Stoneson claimed it had not received but for which it had been billed and for which it had paid. This list totaled 64 loads, but at trial 27 of these were conceded to have been received by Stoneson and only 37 were challenged. Answers to the cross-complaints were filed denying generally any liability in respect thereof. After partial trial, and during a period of continuance for further trial, Stoneson filed an amendment to its amended cross-complaint alleging for the first time that certain loads of lumber which it admitted receiving, and some loads it had theretofore denied receiving were fraudulently short in quantity and defective in quality and it added allegations that three more loads of lumber paid for had not been delivered. The final pleadings in cross actions for damages for fraud then stood so that the several counts in the cross-complaint sought the following recoveries against the following defendants: (1) Oat Valley Lumber Company, a copartnership, $95,232.41 plus $30,000 punitive damages; (2) Oat Valley Lumber Company, a corporation, $89,733.74 plus punitive damages in the sum of $22,500; (3) San Bruno Lumber Company, $114,216.13 plus $50,000 punitive damages; (4) Bowden Lumber Company, $32,677.17 plus $16,000 punitive damages; (5) accumulatively against all cross-defendants $331,859.45 plus punitive damages in the sum of $118,500.

Trial was resumed and after the filing of extensive briefs, the court rendered its opinion and order for findings from which we quote the following:

"An unravelling of the maze of pleadings shows simply that plaintiff seeks money it claims to be due for lumber delivered to Stoneson and unpaid, and Stoneson seeks recovery for amounts it claims it paid the cross-defendants, in some instances for lumber not delivered when represented that it had been, and in other instances poorer quality of lumber had been delivered than represented and paid for.

"The Court has gone very carefully over the pleadings, the transcript of the evidence, and the able briefs submitted by most able counsel, and it is forced to the conclusion that Oat Valley, . . . have proved their cases, but on the other hand

the Court is not at all convinced that any of the cross-defendants have been guilty of any fraud against the cross-complainant.

"Mr. Detweiler, vice-president of Stoneson, has fought a single-handed battle in his attempt to prove such, and has convinced himself of such fraud, but has not been able to so convince the Court. He concedes he knows nothing about the actual facts himself, but he is relying entirely upon records produced. It is evident, however, such records in themselves do not prove fraud on the part of any of the cross-defendants to Stoneson's damage, and it is only upon guess and suspicion that any liability can be established. A case may not be decided on suspicion alone. . . .

"And, of course, as further indication of the uncertainty of Stoneson's position, when it rested at the trial its counsel in open court, in the presence of Mr. Detweiler, conceded it received the lumber shipped to it by Oat Valley (Plaintiff's Exhibit No. 1) and that it didn't claim for shortage of such lumber so received, and that it claimed no defect in the quality of any thereof. . . .

". . . The convincing thing to the Court is, that the evidence shows this lumber was received *by the employees of Stoneson* whose duties were to receive it. In order to avoid this conclusion Stoneson is put in the position of having to say that its such employees were all dishonest and parties to this great conspiracy. This the Court does not believe. Stoneson is in the position of having to claim, and it does claim, that Cagle lied, Sleveland lied, Ottonello lied, McPherson lied, Price lied, Farrell lied, Hanson lied, as did all others who testified to its detriment. One who is compelled to take such a stand is in a pretty weak position, particularly when the testimony of such witnesses stands uncontradicted, and all opposition thereto is based upon pure speculation and guess. (*Raine* v. *Spreckels,* 54 Cal.App.2d 169, 172 [128 P.2d 709].) [Pp. 176-177.] . . . .

## "Quality of Lumber Delivered

"As to quality, Joseph Guiditas, an employee of Stoneson for 20 years up to November, 1956, as a carpenter, who had 9 men working under him during the construction work at Millbrae, testified the quality of lumber from Oat Valley and San Bruno was exactly what they ordered, it was No. 2 or better, and the regulations required that they have this.

"John Kelley, building inspector for San Mateo County, testified he inspected the homes built by Stoneson at Millbrae during the years 1955, 1956, 1957, 1958, and possibly in 1954. About 450 homes were constructed there, and in his inspection he found all lumber that went into these houses was No. 2 or better according to the Code, that he approved all such buildings and never rejected any of it.

### "Quantity of Lumber Delivered

"The Court certainly does not think it possible for any injustice to be done Stoneson in its holding that it received the lumber claimed to have been delivered to it by cross-defendants. Mrs. Donald Guidatos, an employee of Stoneson during the time involved here, in the office as an assistant to Jack Wells, testified by deposition in part as follows:"

(We will here reduce to narrative form the question and answer testimony appearing in the record and quoted *in extenso* in the court's opinion.)

The process in handling invoices was that I received them first, then checked to see that the material had been delivered, and then attached tags to the back of the invoices and checked to see who it was received by. All of them had to be signed or were supposed to be signed and that was our orders from the main office. Then I would code them out and Mr. Wells would O. K. them and check them over and send them back to the main office. We did that in each instance. As far as I know all of the invoices crossed my desk. Before invoices were received from the principal office of Stoneson I had in our files evidence of delivery of lumber. If we didn't we would ask to make sure it had been delivered. We did this by calling up the various lumber companies and asking them to bring out a copy of the tags they had gotten signed out in the yard. They were always checked. . . . You would have to be there to see all the lumber that came into this yard in order to know as much came in as it did. It is unbelievable, you wouldn't know unless you were working around there as to how many truck and trailer loads would come into that lot that would go into various houses and units. Mr. Wells on occasion would go out and interview people in the yard to make sure that certain deliveries were in fact actually made. Once in a while I would go out and check, too, if Jack—especially if a tag would come into the office and it hadn't been signed I would try to check it right away and go out and see who received the load, who

might have absentmindedly forgotten to sign the tag. . . .
We were always supposed to have delivery tags in back of the
invoices signed delivery tag showing it had been received or
else have some proof or signature, like, for instance, Oat
Valley would bring down signed copies of delivery tags . . .
showing it had been received by someone out in the yard.
Otherwise I believe if they ever went up to the main office
without a signature they would either call back or they would
send it back down to us and we would check them out and
see what they were. All the invoices came across my desk be-
fore they were processed out of the tract office. As far as I
know all of the lumber represented by the invoices which were
approved by the tract office for payment and sent back to the
head office of Stoneson represented merchandise, lumber or
other supplies actually received and delivered.

"Similar quotations could be made from the testimony of
witnesses Guiditas, Wells, Robertson, Handy, Dalbec, Hanson,
Kelly, and others, but such would only prolong this opinion.
The testimony is there. The testimony of Mr. Wells is particu-
larly to the point. And while we are on the subject of Mr.
Wells, he was an employee of Stoneson, in charge of the receiv-
ing of all lumber received from the cross-defendants. His
testimony strongly supports the latter's contention that the
lumber involved here was received by Stoneson. Quite an
assault has been made upon the credibility of this witness,
but the Court must say that nothing arising to the dignity of
satisfactory evidence was produced to sustain such attack. He
was here during the entire trial of this case, subject to call at
any time, and he was called several times and rigorously
examined and cross-examined by counsel. His testimony was
not weakened in any material respect at any time so far as
the Court could observe.

"Perhaps some reference should here be further made as to
Stoneson's claim of shortages. Several witnesses (mostly
truckers who delivered to Stoneson) testified as to practices of
changing, withdrawing from and adding to, loads that origi-
nally came from Oat Valley. There is nothing to show from
all this, however, that Stoneson did not get all the lumber
billed to it by the various shippers. Rather it goes to explain
some of the circumstances claimed by Stoneson to be sus-
picious.

"The cross-action of Stoneson is based entirely upon fraud
and conspiracy. The Court holds none such has been proved.

If breach of warranty is relied upon, Stoneson cannot recover by reason of its failure to observe its shortage and give notice thereof within a reasonable time. Civil Code Section 1769.

"Although Stoneson has changed its position several times since the institution of this action, and while Mr. Detweiler was the principal witness for Stoneson, the Court does not think that he was dishonest in any of his contentions. He had discovered that Oat Valley, Ottonello, and others, had been dishonest in their dealings with the State and Federal Governments. There were, indeed, other things which would excite the suspicion of any prudent person, but when it came to proving facts he was unable to produce convincing evidence of his claims. The Court must say that this is not too unusual in a lawsuit. The Court must take the record as it finds it. Stoneson has placed all of its eggs in one basket by claiming damages by reason of fraud of Oat Valley, San Bruno, and Bowden and Ottonello. As above indicated, such fraud has not been proved to the satisfaction of the Court."

After findings of fact and conclusions of law and judgment were signed a motion for new trial was made and denied, but the court ordered the case reopened and resubmitted. The court rendered its second opinion and order for findings, the significant portion of which reads:

"The Court set aside the findings and judgment herein, in order that it could give further consideration to the merits of the case, particularly in view of the fact that admittedly *some* of the witnesses in the case were dishonest in their dealings with the State and Federal governments, and any Judge, including this one, will view with grave suspicion the testimony of such persons. At the same time, a Judge must not, and cannot, say, without *some* substantial evidence, that simply because a man was dishonest in one matter, such is proof that he was dishonest in the one at bar. The Court has endeavored to keep the aforesaid principles uppermost in his mind at all times, and to decide this case upon the evidence as presented and in accordance with the rules applicable thereto, particularly that in regard to the burden of proof.

"The Court desired to take some further time to reconsider the case to see if it possibly had committed some substantial error in its original opinion. Further observation in regard thereto will hereafter appear.

"Another reason the findings and judgment have been set aside was in view of the statement made in cross-complainant

Stoneson's opening brief on motion for a new trial, wherein it is said:

" 'The apparent weight that the Court has given to the oral testimony of discredited witnesses (witnesses who were subject to influence and pressures) and the Court's complete disregard of documentary evidence not subject to the vagaries aforesaid, which conclusively demonstrates fraud on the part of the cross-defendants, is hard to understand. In instance after instance the records of the cross-defendants, their haulers and their suppliers, clearly showed the fraudulent invoicing without delivery, falsification of the amount of board feet delivered, and the misrepresentation of the grade of lumber invoiced by the cross-defendants.'

"This paragraph sets forth the cross-complainant's position in a nutshell. It has fully convinced itself that such statements are true. After a careful reappraisement of the case the Court is just as fully convinced as it ever was that they are *not true*. The 'discredited' witnesses and the witnesses who were 'subject to influence and pressure' are those that the cross-complainant does not choose to believe. This is natural, because if it did it would have no case here at all.

"The clarity of the showing claimed by cross-complainant of the fraud on the part of the cross-defendants, their haulers and suppliers, apparently appears only to the cross-complainant. It is the Court's belief that every one of its claims has been shown to be without substantial weight in the briefs of the cross-defendants. The cross-complainant currently claims (this was not always so) that there was a defect in the *quality* of the lumber delivered. This has been refuted by witnesses whose integrity has never been questioned even by cross-complainant Stoneson, as is set forth in the original opinion of the Court. As to *quantity*, there again cross-complainant has never been able to stand on any solid foundation. It has changed its position time after time, sometimes under oath. (See its pleadings). This is mentioned merely to show the sincerity and assurance with which cross-complainant has contended for its later admitted erroneous claims. And its contentions are, and always have been, based solely upon records which it insists show fraud and conspiracy on the part of many people, quite a number of them being its own employees. As indicated in the Court's original opinion, this is all based upon pure guesswork and speculation, and will

not stand up against the testimony of witnesses who say that the lumber was actually received, and whose testimony for the most part stands unimpeached.

"If there were shortages, one would expect the records of Stoneson to show this. This they do not do.

"In regard to the claim that the Court disregarded documentary evidence in the case, such is certainly a mis-statement. The Court spent several days working on the decision, after a trial of many days duration. It kept copious notes of all testimony and was aided by the Reporter's transcript thereof kindly furnished to it by defendant and cross-complainant Stoneson. The many, many exhibits were examined with great care. The able, detailed and extended briefs of all counsel were read and re-read, as were the many and complicated pleadings. . . .

"The Court has again carefully considered the case, has again read all the briefs of counsel, and must now say that . . . it is entirely satisfied with the opinion heretofore filed herein and which the Court readopts."

The findings of fact found that the 63 loads sued upon by Oat Valley were delivered and the amount owing for the same was due; that Stoneson's allegations of fraudulent representations on the part of respondents as to delivery, or deficient delivery in quantity or quality were not true; that the lumber sold and delivered was of the quantity and quality set forth in the respective invoices and that it was not true that Stoneson was damaged in any amount.

■ Our review of the record in the light of the briefs on file has led us to the conclusion that the findings of the trial court are substantially supported in every particular. If it be conceded that the records introduced by Stoneson and the inferences to be drawn therefrom make prima facie proof of misdealing on the part of plaintiff and of the several cross-defendants, it is apparent that we have here nothing more than a conflict in evidence and under the well-known rule the judgment cannot be reversed. The situation presented by the record is aptly described in those portions of the opinions of the trial court from which we have quoted. We have studied the extensive briefs filed by appellant Stoneson and have examined the record sufficiently to establish that the evidence at best is in conflict upon every disputed point. We think it unnecessary to treat of these matters *in extenso*.

■ Appellant in its brief places its emphasis upon its cross-complaints for fraud and says: "It clearly appears that the trial Court, in weighing the evidence, held the Appellants to a degree of proof far greater than the required preponderance. Further, the trial Court, contrary to existing California law, apparently required direct proof of the fraud charged and ignored the circumstantial evidence presented. The law is clear that fraud may be proved by circumstantial evidence and that the one charged with sustaining the burden of proof is entitled to the assistance of such presumptions and inferences that may be raised by the facts produced in proof." We are unable to see any ground for the charge that the trial court held appellants to a degree of proof greater than the required preponderance. On the contrary, and based upon substantial evidentiary support, the trial court declared flatly that the preponderance of proof lay with the cross-defendants and the facts and circumstances noted by the trial court in the making of that assertion abundantly support the same. Nowhere does it appear that the trial court required direct proof of fraud and ignored circumstantial evidence in proof thereof. On the contrary, it clearly appears that the trial court weighed the circumstantial proof and, placing it against the direct testimony that the deliveries claimed for were made, that the quantities paid for were received, and that the quality contracted for had been delivered, and having so placed the circumstantial evidence against the direct evidence, concluded that the preponderance of proof lay with the direct evidence. For instance, as noted by the trial court on the question of quality, that is, that lumber required to be Number 2 or better had been less than Number 2 in substantial quantities, the trial court noted the testimony of Stoneson's employee, to the effect that the quantity and quality of the lumber had been inspected as received, and noted further the testimony of the witness who had inspected the 450 houses constructed by Stoneson by the use of lumber received from Oat Valley and others that, as required by the law governing such construction, the lumber used was Number 2 and better.

For the reasons given, the judgment appealed from is affirmed.

Peek, J., and Schottky, J., concurred.